# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

**SMHC LLC,** *et al.*[1]

         Debtors

_____/

Case No. 14-45579
Chapter 11
Jointly Administered
Hon. Marci B. McIvor

# COMBINED PLAN OF REORGANIZATION
# AND DISCLOSURE STATEMENT OF
# SMHC LLC AND VALUE HOMES, L.L.C.

Prepared by:

Jason W. Bank (P54447)
Kerr, Russell and Weber, PLC
Counsel for Debtors
500 Woodward Avenue, Suite 2500
Detroit, Michigan 48226
(313) 961-0200
jbank@kerr-russell.com

---

[1] The Debtors in these jointly administered Chapter 11 cases are SMHC LLC (Case No. 14-45579) and Value Homes, L.L.C. (Case No. 14-45581).

## INTRODUCTION

Debtors, SMHC, LLC. ("SMHC") and Value Homes, L.L.C. ("Value Homes") ("Debtor" or "Debtors"), propose the following Combined Plan of Reorganization and Disclosure Statement (the "Plan") pursuant to §§1121 and 1123 of the United States Bankruptcy Code (the "Code").

Debtors reserve the right to amend or modify the Plan and/or incorporate amendments or modifications to the Plan into the Confirmation Order (as defined below) in accordance with the Plan and the Bankruptcy Code.

## PLAN OF REORGANIZATION

## ARTICLE I
## DEFINITIONS, RULES OF INTERPRETATION AND
## COMPUTATION OF TIME

For purposes of the Plan, the following terms shall have the meaning set forth below, unless the context requires otherwise:

1.1 "Administrative Claim" means Allowed Claims for costs and expenses of administration of this Chapter 11 case allowed under §§503(b) and 507(a)(2) of the Bankruptcy Code, and the fees of the United States Trustee under 28 U.S.C. §1930(a)(6) arising prior to the Effective Date.

1.2 "Administrative Creditor" means a holder of an Administrative Claim.

1.3 "Allowed Claim" or "Allowed Interest" means a Claim against or Interest in the Debtor to the extent that:

    A. A proof of claim or interest was:

        (1) Timely filed;

        (2) Deemed filed pursuant to §1111(a) of the Code; or

        (3) Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtor, and counsel for Debtor; and

1.4 "Avoidance Actions" means Causes of Action of the Debtor, Estate or Reorganized Debtor arising under Chapter 5 and any related sections of the

Bankruptcy Code, including without limitation, Section 502, 510, 541, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Cause of Action.

1.5 "Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§101, et seq.).

1.6 "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, and any court having jurisdiction to hear appeals therefrom.

1.7 "Bankruptcy Rules" or "Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991, and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

1.8 "Bar Date" means the date established by the Bankruptcy Court for the filing of any Claims.

1.9 "Business Day" means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

1.10 "Case" or "Cases" means the bankruptcy cases currently pending before the Bankruptcy Court entitled *In re SMHC LLC*, Case No. 14-45579, and *In re Value Homes, L.L.C.*, Case No. 14-45581.

1.11 "Cash Collateral Order" means the First Interim and Final Order Authorizing the Debtor's Use of Cash Collateral and Providing Adequate Protection (entered April 4, 2014, Docket No. 19), and any other cash collateral order entered by the Court.

1.12 "Causes of Action" means all claims, rights and causes of action belonging to the Debtors and upon confirmation, the Reorganized Debtors, including but not limited to any claims or causes of action and any claims or causes of actions against any third parties for collection of accounts receivable, rent, installment payments or otherwise, and any and all proceeds of the foregoing. "Causes of Action" shall not include Avoidance Actions.

1.13 "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.14 "Claimant" means any individual or entity which has a valid Claim as defined herein.

1.15 "Class" means a class of holders of Claims or Interests described in Article III of this Plan.

1.16 "Confirmation Date" means the date upon which the Bankruptcy Court shall enter an order confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.17 "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court to consider the confirmation of the Plan filed by Proponent.

1.18 "Confirmation Order" means the Order entered confirming this Plan pursuant to §1129 of the Code.

1.19 "Contested Claim" or "Contested Interest" means any Claim or Interest as to which Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

1.20 "Creditor" means any holder of a Claim against the Debtor.

1.21 "Debtor" or "Debtors" means both SMHC LLC and Value Homes, L.L.C. Unless otherwise stated, every reference within the Plan to "Debtor" shall collectively refer to both SMHC and Value Homes.

1.22 "Debtor-In-Possession" means SMHC LLC and Value Homes, L.L.C. in their capacity as debtors-in-possession as term as defined in the Bankruptcy Code in the Bankruptcy Case.

1.23 "Disclosure Statement" means the Disclosure Statement that relates to and is being filed contemporaneously with this Plan as amended and approved by an order of the Bankruptcy Court.

1.24 "Effective Date" means the first (1st) business day after the Confirmation Order becomes a Final Order.

1.25 "Estate" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.26 "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed; or (iii) an appeal has been timely taken but such order has not been stayed within ten (10) days after the filing of such appeal.

1.27 "Impaired" means a Claim treated under this Plan, unless the Plan:

A. leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

B. notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

(1) cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default by the Debtor; (ii) the solvency or financial condition of the Debtor or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

(2) reinstates the maturity of such Claim or Interest as such maturity existed before such default;

(3) compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(4) does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles its holder.

1.28   "Insider" shall mean a current or former director, shareholder, officer, partner, person in control, relative of a director, officer, partner or person in control of the Debtor or a corporation or entity in which an Insider (as defined above) of the Debtor is an Insider.

1.29   "Intercompany Receivable" shall mean the indebtedness owed by Value Homes to SMHC arising from the transactions more fully described in Section II of the Disclosure Statement.  The Intercompany Receivable equaled $1,425,242.96 as of the Petition Date and has continued to increase since the Petition Date.

1.30   "Interest" means an equity interest in Debtor as defined in §101(16) of the Code.

1.31   "Interest Rate" means (a) with respect to Claims entitled to interest under §506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest evidenced by a writing signed by an executive officer of the Debtor the lowest rate of interest provided in such contract, without regard to any default by Debtor, (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, the applicable statutory rate for such Claims or, if no statutory rate exists, 4.0% per year, or (c) with respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.32   "Interested Parties" means all counsel of record, including counsel for Debtor, the Office of the United States Trustee, any Secured Creditor that has not been paid in full and any counsel that has appeared for a Secured Creditor that has not been paid in full.

1.33   "Lien" means any security interest, lien, tax lien, mortgage, encumbrance, common law or statutory lien, charge against, or an interest in property to secure payment of a debt or performance of an obligation.  "Lien" shall be defined as, and interpreted in, as broad a manner as possible.

1.34   "Oakland County Claim" means the claim asserted by the Oakland County Treasurer against SMHC in the amount of $3,428.01, plus any accrued interest and charges, arising from real property taxes associated with the real property located at 832 N. Pontiac Trail, Walled Lake, Michigan.

1.35   "Petition Date" means April 1, 2014, the date that SMHC and Value Homes each filed its Chapter 11 voluntary petition.

1.36　"Personal Property" includes all of the Debtor's presently owned and hereafter acquired goods, machinery and equipment, inventory, deposit accounts, accounts receivable, cash, cash equivalents, documents, investment property, payment intangibles, chattel paper, including electronic chattel paper, instruments, commercial and other tort claims, furniture, fixtures, patents, applications for patents, rights to refunds of deposits and memberships, pre-paid insurance, cash surrender values of insurance policies, right to proceeds of life insurance policies on lives of present, future, and former employees, letter of credit rights, general intangibles, deposit accounts, securities, derivatives, vehicles, contract rights, including purchase orders, software licenses and technology, together will all proceeds of the foregoing, including, without limitation, all cash, checks, drafts, accounts receivable, chattel paper, leases and instruments received by Debtor in connection with any sale, lease, exchange or disposition of any of the foregoing, and to the extent not otherwise included; all proceeds and products and proceeds and products therefrom, of all and any of the foregoing and all collateral security and guarantees granted or given by any person or entity with respect to any of the foregoing.

1.37　"Plan" means this Plan of Reorganization, as it may be altered, amended or modified from time to time.

1.38　"Priority Claim" means a Claim under or entitled to priority under § 507 of the Code.

1.39　"Professional Fees" means the fees and reimbursement for disbursements owed to attorneys, accountants, or other professionals whose employment has been approved by the Bankruptcy Court.

1.40　"Proponent" means SMHC and Value Homes, the proponents of the Plan.

1.41　"Reorganized Debtor" means SMHC and Value Homes upon their emergence from Chapter 11, at the time the Confirmation Order becomes a Final Order and thereafter.

1.42　"Secured Claim" means a Claim secured by a Lien on property in which the estate has an interest but only to the extent of the value of the Creditor's interest in the estate's interest in the property as of the Petition Date.

1.43　"Signature" means Signature Bank and all of its predecessors, successors, transferees, assignees, agents and employees.

1.44    "Signature Claims" means any and all claims that may be asserted by Signature against Value Homes or any other affiliate or guarantor, including, but not limited to, claims arising from that certain promissory note and related loan documents executed by Value Homes in favor of Signature prior to the Petition Date.  The balance of the Signature Claims as of May 1, 2014 equals $948,838.90.

1.45    "SMHC" means SMHC LLC, a Michigan limited liability company and one of the Debtors in the case.

1.46    "SMHC Properties" means the real estate containing the eight manufactured home properties owned by SMHC, as more fully set forth in Article II.A of the Disclosure Statement.

1.47    "Talmer" means Talmer Bank & Trust and all of its predecessors, successors, transferees, assignees, agents and employees or any other entity asserting the Talmer Claims against Debtors that were assigned to Talmer Bank & Trust.

1.48    "Talmer Claims" means any and all claims that may be asserted by Talmer or its predecessors against SMHC and Value Homes or any other affiliates or guarantors, including, but not limited to, claims arising from those certain promissory notes, mortgages, security agreements, and any loan documents executed by SMHC, Value Homes or their affiliates in favor of Talmer or its predecessors prior to the Petition Date.

1.49    "Unimpaired" or "Unimpaired Claim" means a Claim treated under this Plan that leaves unaltered the legal, equitable, and contractual rights of such Claim.

1.50    "Unsecured Claim" means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

1.51    "Value Homes" means Value Homes, L.L.C., a Michigan limited liability company and one of the Debtors in the case.

A term used in the Plan and defined in the Bankruptcy Code but not defined herein, has the meaning assigned to that term in the Bankruptcy Code.

# ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

Administrative Creditors and Priority Creditors shall be paid on account of their respective Administrative and Priority Claims in accordance with the provisions set forth below:

2.1 **GROUP I**. The Claims of Group I shall consist of all Administrative Claims, including any taxes that qualify as Administrative Claims. The Allowed Claims of this Group shall be paid the full amount of their Claims on such date as may be mutually agreed upon between Debtor and the particular claimant, or, if no such date is agreed upon, the latest of (i) the Effective Date, (ii) the date by which payment would be due in the ordinary course of business between the Debtor and such Administrative Creditor, or (iii) the date on which the Bankruptcy Court enters its order, if necessary, approving the Debtor's payment of such expenses. All Professional Fees that are the subject of pending fee applications before the Bankruptcy Court, or that have already been allowed by the Bankruptcy Court but which remain unpaid as of the Effective Date, unless otherwise agreed by such professionals, shall be paid in full, in cash, (i) on the Effective Date, or (ii) within 14 days after a Final Order of the Bankruptcy Court has been entered authorizing their payment, whichever is later. By the date of the Confirmation Hearing, the Debtor shall escrow sufficient proceeds in the client-trust account of its counsel to satisfy all Professional Fees, which funds will be held in escrow pending Court approval.

2.2 **GROUP II**. The Claims of Group II shall consist of all Allowed Claims that are entitled to Priority under of the Code. The sole Claim of this Group shall be the Oakland County Claim.

2.2.1 The Claimant of this Group shall receive deferred, equal monthly cash payments over a period not exceeding five (5) years from the date of assessment, if any, of a value of the Effective Date of the Plan equal to the allowed amount of such Priority Claims plus interest calculated at the Interest Rate. Payments this Group, if any, shall begin one (1) month after the Effective Date. The Priority Claim shall be amortized to allow for an equal monthly payment of both principal and interest.

2.2.2 The Debtors shall retain the option to satisfy the claims of this Group, including the Oakland County Claim, in full via payment on or after the Effective Date.

2.3    The Reorganized Debtor shall have the right to challenge or object to any Administrative Claims and Priority Claims through the claims objection process set forth in Article VIII of this Plan, which challenge may include but is not limited to a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the computation of the tax.  The right to challenge these claims shall include, without limitation, an objection to the assessment of the Debtor's personal property that may or may not have been made by the respective taxing authority.

2.4    To the extent that an objection is filed, the Debtor shall not be obligated to pay any Allowed Priority Claim until a determination of the amount of the Priority Claim has been made by the Bankruptcy Court.  Payments to these Priority Claims that are ultimately Allowed shall commence on the first business day of the calendar quarter following the Court's final determination of the allowability of all of the Claims in this Class.

2.5    Until such time as the Priority Claim has been fully and indefeasibly paid, the Priority Claimant shall retain any and all Liens that it may have which shall remain in full force and effect, with the same Priority and to the same extent that existed on the Petition Date.  Upon payment in full of the Priority Claim, the Priority Claimant shall release and extinguish all Liens and execute any and all documents reasonably requested by the Debtor to memorialize same.

## ARTICLE III
## DESIGNATION AND TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

The Plan divides Claims and Interests into three classes and treats them as follows:

3.1    **Class I**.  Class I consists of the Talmer Claims against the Debtors, which total approximately $18,208,244.53 as of March 31, 2014.

3.1.1 Talmer's Allowed Secured Claim against SMHC shall equal $10,702,168.22.  Talmer's Allowed Secured Claim against Value Homes shall equal $2,066,422.29.

3.1.2 On the Effective Date, the Talmer Allowed Secured Claim against SMHC and the Talmer Allowed Secured Claim against Value Homes shall be re-amortized over a fifteen (15) year period and shall accrue interest at an interest rate of (4%) percent.

3.1.3 SMHC and Value Homes shall each make monthly, interest only payments towards the Talmer Allowed Secured Claims beginning on the 22nd day of the month after the Effective Date and continuing for eighteen (18) months thereafter (with payments due on the 22nd of each month). Beginning on the 22nd day of the nineteenth (19th) month after the Effective Date, SMHC and Value Homes shall each make monthly payments, due and payable by the 22nd of each month, towards the Talmer Allowed Secured Claims based upon the fifteen-year amortization schedule.

3.1.4 The Talmer Allowed Secured Claims shall mature and shall be paid by the 22nd date of the month after the fifth (5th) anniversary of the Effective Date. There shall be no prepayment penalties, and SMHC and Value Homes are free to pay the Talmer Allowed Secured Claims at any point without any additional interest charges, penalties or fees added.

3.1.5 Talmer's Liens against Debtors' assets shall remain in full force until the Talmer Allowed Secured Claims have been satisfied in full. Upon satisfaction of the Talmer Allowed Secured Claims, Talmer's Liens against all of the assets of SMHC and Value Homes shall be released and extinguished and Talmer shall execute any documents reasonably requested by Debtors to release all of its Liens against Debtors' assets.

3.1.6 The remaining portion of Talmer's Claims shall constitute Unsecured Claims. SMHC and Value Homes shall not be required to make any payments towards Talmer's Unsecured Claims. If Talmer's Allowed Secured Claims are satisfied in accordance with the terms of the Plan (or unless otherwise agreed to in writing by Talmer), Talmer's Unsecured Claims shall be deemed fully satisfied.

3.1.7 Talmer shall not pursue collection of the Talmer Claims from any guarantors of Debtors' obligations to Talmer, so long as Debtors comply with the terms of Article 3.1 of this Plan.

**This Class is Impaired.**

3.2 **Class II.** Class II consists of the Signature Claims, which total $948,838.90 against Value Homes only, as of May 1, 2014.

3.2.1 Signature shall continue to receive its regular, monthly payments from Value Homes pursuant to the terms of the Signature loan documents.

3.2.2 The Signature Claims shall continue to accrue interest at the non-default interest rate in accordance with the Signature loan documents.

3.2.3 Value Homes, at its sole option, may satisfy the Signature Claims at any time without a prepayment penalty.

3.2.4 Signature's Liens against nondebtor assets shall remain in full force in effect until the Signature Claims are satisfied. Upon satisfaction of the Signature Claims, Signature's Liens against nondebtor assets shall be extinguished and Signature shall execute any documents reasonably requested to release its Liens.

3.2.5 Signature shall not pursue collection of the Signature Claims from any guarantors of Value Homes' obligations to Signature, so long as Value Homes complies with the terms of Article 3.2 of this Plan.

**This Class is Not Impaired.**

3.3 **Class III.** Class III consists of the Interests of the equity security holders. The rights of the Interest Holders shall remain intact as they existed as of the Petition Date.

**This Class is Not Impaired.**

## ARTICLE IV
## MEANS OF EXECUTION OF THE PLAN

4.1 **The Reorganized Debtor.** On the Effective Date, all of Debtor's right, title and interests in and to all remaining property of the Estate of whatever kind, type or nature, including, without limitation, any real property, contractual interests, intangibles, claims, suits, setoffs, recoupments, any avoidance proceedings under the Code, or any applicable state, federal or other laws and any and all equitable or legal rights, claims, interests and remedies of the Debtor, shall revest in the Reorganized Debtor to be operated and distributed by the Reorganized Debtor pursuant to the provisions of the Plan.

The Reorganized Debtor shall have full responsibility for maintaining and preserving all of the Debtor's Personal Property and any other assets or interests of the Debtor until all disbursements are made in accordance with the provisions of the Plan.

4.2 **Professional Fees Of Debtor**.  Any services performed or expenses incurred by any professional on behalf of the Debtor with respect to this Case after the Confirmation Date, shall not be subject to the prior review and approval of the Bankruptcy Court and, notwithstanding any provision of the Bankruptcy Code or Rules, including, without limitation, Fed. R. Bankr. P. 2016, after the Confirmation Date, no professional shall be required to disclose payments from the Debtor or the Reorganized Debtor to the Bankruptcy Court or the United States Trustee.  All fees and expenses arising after the Confirmation Date shall be billed directly to the Reorganized Debtor.

4.3 **Change of Address**.  In order to ensure that it receives its distribution, each Creditor must advise the Reorganized Debtor of any change in address.  Absent any such notification, the Reorganized Debtor must send payments to the address listed on the Matrix on file with the Bankruptcy Court.

4.4 **Notices**.  All notices required by this section must be in writing and must contain full disclosure of the terms of any proposed sale or compromise.  If any notice required by this section is sent by mail, an Interested Party shall have an additional three (3) days to send an objection to the proposed action contained in the notice.

4.5 **Litigation**.  All Avoidance Actions are expressly waived as of the Effective Date.  Upon the Effective Date, all Causes of Action are expressly preserved and vested in the Reorganized Debtor, regardless of whether such specific claim is listed in the Plan or Disclosure Statement.  No preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any Causes of Action as a consequence of the Confirmation, the Effective Date or consummation of the Plan.

## ARTICLE V
## EXECUTORY CONTRACTS

5.1 Unless otherwise assumed, assigned or rejected by Final Order of the Bankruptcy Court, all executory contracts of the Debtor, including but not limited to any leases of real or personal property, either (i) not expressly rejected, or (ii) which are not within thirty (30) days after the Confirmation Date the subject of pending motions to reject, shall be deemed assumed as of the Effective Date.

5.2 Any Creditor who has a Claim as a result of such rejection shall have thirty (30) days after receipt of the Notice to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.  The Notice shall contain a provision

informing any potential creditor of this requirement and shall be served on such potential creditor(s).

5.3    The Reorganized Debtor may file an objection to any Proof of Claim filed pursuant to paragraph 5.2.

## ARTICLE VI
## MODIFICATION OF THE PLAN

6.1    Debtor may, from time to time, propose amendments or modifications of this Plan prior to its confirmation, without leave of the Court.    After confirmation, the Reorganized Debtor may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

6.2    If the Bankruptcy Court determines that the modification affects all the Creditors, or if the Reorganized Debtor proposes a material modification affecting all Creditors, then such modification shall be governed by §1127 of the Bankruptcy Code.

6.3    The Confirmation Order, which may contain amendments or modifications to the Plan, shall incorporate all of the provisions of the Plan, except as expressly modified by the Confirmation Order.

## ARTICLE VII
## EFFECT OF CONFIRMATION ON CLAIMS

7.1    **Discharge of Indebtedness**:    Except as provided in this Plan, Confirmation shall act as a merger, relinquishment and full satisfaction of any and all Claims those Creditors have, or may have, against the Debtor and the Reorganized Debtor as provided in the treatment of the Creditors in Articles II and III.

7.2    Confirmation of the Plan shall modify and alter the rights of all Creditors and holders of Interests as provided herein. Creditors or holders of Interests shall be prohibited from asserting any further claims against the property of the Debtor based upon any act, transaction or indebtedness which is the subject matter of any Claim or Interest, or based upon any guarantee of collection,

payment or otherwise made by the Debtor as to any obligation of any persons, firm or entity.

## ARTICLE VIII
## OBJECTIONS TO CLAIMS AND INTERESTS

8.1    The Debtor or Reorganized Debtor may object to the allowance of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the Schedules filed by a Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of filing of any Proof of Claim or (b) sixty (6o) days after the Effective Date.

8.2    As part of the objection process set forth in paragraph 8.1 above, and without limiting same, the Debtor and the Reorganized Debtor shall have the right to object to any Lien.

## ARTICLE IX
## UNITED STATES TRUSTEE FEES

The Debtor shall pay to the United States Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6).  After Confirmation, and until the case is closed by the Court, Debtor and the Reorganized Debtor shall pay all post-confirmation fees on all disbursements of the Debtor and the Reorganized Debtor and shall follow all procedures of the United States Trustee for reporting and tracking such disbursements.

## ARTICLE X
## RETENTION OF JURISDICTION

10.1    Notwithstanding confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for the following purposes until the entry of a final decree closing this case:

A.    To determine all objections to the allowance of Claims;

B.    To approve or disapprove any compromise by the Reorganized Debtor of any Claim;

C.  To determine all disputes arising under the Plan, including any dispute over any action taken by the Reorganized Debtor, and to enforce, interpret and administer the terms and conditions of the Plan;

D.  To determine any applications for allowance of compensation and reimbursement of expenses as may be required for pre-confirmation services;

E.  To determine any applications for rejection, assumption, or assignment of executory contracts and the allowance of any claims resulting from the rejection thereof or from the rejection of executory contracts pursuant to the Plan;

F.  To determine any applications, adversary proceedings, and contested and litigation matters pending in the case at the Confirmation Date or thereafter filed;

G.  To determine any applications on file for approval of settlement agreements and entering and enforcing all appropriate orders in connection therewith;

H.  To authorize Reorganized Debtor to abandon property of the Estate;

I.  To modify any provisions of the Plan pursuant to the Rules, the Code and provisions of the Plan;

J.  To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

K.  To determine such other matters provided for in the Confirmation Order as may, from time to time, be authorized under the provisions of the Code or any applicable law;

L.  To enforce all orders, judgments, injunctions, and rulings in connection with this proceeding; and

M.  To enter such orders that may be necessary or appropriate to aid in confirmation and to facilitate implementation of the Plan.

# ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1   In the event the holder of any Claim shall transfer such Claim after the Confirmation Date, it shall immediately advise the Reorganized Debtor in writing of such transfer and the Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until it shall have received written notice of the transfer.  Each transferee of any claim shall take such claim subject to the provisions of the Plan and any requests made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in the notice, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all right and powers of the transferor under the Plan.

11.2   Any services performed or expenses incurred by any professional on behalf of the Debtor with respect to this Case after the Confirmation Date shall not be subject to the prior review and approval of the Bankruptcy Court.   All Professional Fees and expenses shall be billed directly to the Debtor.  Objections to such fees and expenses must be filed and served within 5 days of receipt of the statement.   The Bankruptcy Court shall retain jurisdiction to review only the portion to which an objection has been filed.  The portion not objected to shall be paid by the Reorganized Debtor in accordance with the terms of the invoice.

11.3   Notwithstanding any provision of the Bankruptcy Code or the Bankruptcy Rules to the contrary, no professional shall be required to file a 2016(b) statement for any fees or expenses received after the Confirmation Date.

11.4   Notwithstanding anything in this Plan to the contrary, neither the Debtor, nor the Reorganized Debtor shall be obligated to make any payments towards any Contested Claim.  Further, neither the Debtor nor the Reorganized Debtor shall be required to make any payments for an Allowed Claim to any Creditor if the Debtor, or the Reorganized Debtor have filed a motion, objection, adversary proceeding, state court proceeding or other similar notice against such Creditor alleging an objection, claim, cause of action, offset or counter-claim, such that if sustained and not paid by such Creditor would result in a disallowance of such Allowed Claim in accordance with §502(d) of the Code, provided, however, that the Reorganized Debtor shall escrow a sufficient amount to pay such Contested Claim in full, in the event that it is allowed.

11.5   Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax

or governmental assessment in the United States, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

11.6 The Debtor, the Reorganized Debtor and all parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan.

11.7 Except as expressly provided in the Plan, the Reorganized Debtor shall have the right to commence, continue, amend or compromise all Causes of Actions available to the Debtor, the bankruptcy estate or the debtor in possession, whether or not those Causes of Action were the subject of a suit as of the Confirmation Date.

**DISCLOSURE STATEMENT**

## I.     INTRODUCTION

### A.     Purpose of Disclosure Statement

Debtors submit this Disclosure Statement pursuant to §1125 of the Bankruptcy Code, 11 U.S.C. §§101 et seq., to all known holders of Claims and Interests. Debtors have filed the Plan with the United States Bankruptcy Court for the Eastern District of Michigan, a copy of which accompanies this Disclosure Statement.

Debtors provide this Disclosure Statement to the Creditors to disclose information deemed to be material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote for the acceptance of the Plan.

### B.     Source of Information

The Disclosure Statement and the Plan have been prepared from information furnished by Debtors' management. Debtors' counsel has not conducted an independent investigation to verify such information.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY DEBTORS OR THE COURTS TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING DEBTOR, ITS OPERATIONS, OR THE VALUE OF ITS PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS, PROMISES OR INDUCEMENTS, PARTICULARLY REGARDING DEBTOR'S PROPERTY OR FUTURE INCOME, MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, THAT ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. SUCH REPRESENTATIONS, INDUCEMENTS AND/OR PROMISES SHOULD BE REPORTED TO COUNSEL FOR DEBTOR WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

## II.    DESCRIPTION OF DEBTORS

### A.    Debtor-in-Possession

On April 1, 2014, Value Homes and SMHC each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan, thereby commencing the Cases, which was assigned to the Honorable Marci B. McIvor.

Upon filing its Voluntary Petition under chapter 11, each of the Debtors became a "Debtor-in-Possession" as that term is defined in the Bankruptcy Code.

No committee of unsecured creditors has been appointed in the Cases.

### B.    The Debtor's Principals

#### 1.    Background

Ralph Scofield is the founder and managing member of SMHC and Value Homes.

#### 2.    Ownership

The Ralph Scofield Living Trust holds one hundred (100%) percent of the membership interests in SMHC.  The Ralph Scofield Living Trust holds ninety (90%) percent of the membership interests in Value Homes and Steven Combs holds ten (10%) percent of the membership interests in Value Homes.

#### 3.    Compensation

In the year prior to the Petition Date, Ralph Scofield received $51,211.38 from SMHC and additional compensation prior to January 1 from Scofield Management, the predecessor of SMHC.  Mr. Scofield received no compensation from Value Homes. Steven Combs received $86,498.00 in compensation from Scofield Management and $27,000 from SMHC. Mr. Combs received $95,902.17 from Value Homes ($94,293.00 of loan principal and $1,609.17 of interest payments.

#### 4.    Legal Relationships with the Debtor/Insider Transactions

The following is a summary of legal relationships and transactions involving insiders impacting upon the Cases:

**Lease:** In January 2010, Value Homes entered into a Site Rent Agreement with Scofield Management (predecessor of SMHC). Under this Agreement, Value Homes pays site rent to SMHC for manufactured home sites that it occupies until the date that a retail home purchaser begins paying the site rent.

**Fees:** Value Homes pays SMHC monthly fees for the use of employees, facilities and certain equipment owned by SMHC based upon the following formulas:

- Value Homes - inventory x 1-1/2% divided by 12

- Value Homes - contracts receivable x 1-1/2% divided by 12

- Value Homes – homes sales - $500 each

**Insider claims.** As of the Petition Date, Value Homes owed SMHC $1,425,242.96 arising from indebtedness owed from the aforementioned transactions (the "Intercompany Receivable"). The amount of the Intercompany Receivable has increased since the Petition Date.

**Transfers:** In the approximate year prior to the Petition Date, there were $109,000 in advances from SMHC to Value Homes in addition to Value Homes not paying SMHC for any of the services SMHC provided.

**Assignments:** Prior to the Petition Date, Ralph Scofield and the Ralph E. Scofield Living Trust owned the SMHC Properties and operated the manufactured home parks under the name, "Scofield Management" and granted mortgages in favor of Talmer over the SMHC Properties. In 2013, Mr. Scofield formed SMHC and the SMHC Properties were transferred to SMHC. Subsequently, SMHC, Ralph Scofield, and the Ralph E. Scofield Living Trust entered into a Transfer and Assumption of Promissory Note and Related Mortgage in favor of Talmer.

### C.   Description of Debtor's Business and Causes for Chapter 11

### 1.   Debtor's Business and Industry

SMHC LLC is a Michigan limited liability company with its principal office in Clyde, Michigan. SMHC owns and operates eight manufactured home parks in the southern half of Michigan's lower peninsula (collectively, the SMHC Properties"):

- Swartz Creek Estates (Swartz Creek, MI)

- South Valley Estates (Charter Township of Flint, MI)

- Loon Lake (Fenton Township, MI)

- East Bay (Fenton Township, MI)

- Sugar Tree (Caro, MI)

- Fawn Lake Estates (Walled Lake, MI)

- North Bay Harbor Club (Deerfield Township, MI)

- Lake Fenton (Fenton Township, MI)

SMHC has 20 employees: 7 full-time employees and 13 part-time employees. SMHC enters into various manufactured home site lease agreements and rents the land to individuals who purchase manufactured homes, and in the past, generally financed them with third party lenders.

Value Homes is a Michigan limited liability company with its principal office in Clyde, Michigan. Value Homes buys, refurbishes and sells manufactured homes in the mobile home parks operated by SMHC. Many of the manufactured homes that Value Homes purchases are homes where owners have defaulted in payments to their third party secured lenders. Value Homes resells the homes to new owners who keep the homes in the SMHC Properties and thus maintain the going concern value of the various properties.

### 2.   Causes for Chapter 11 filing

Debtors' financial problems are a direct result of the economic collapse that the State of Michigan experienced over the past decade, and in particular, the significant depreciation in real estate values.

The SMHC Properties were appraised for $26.3 million in appraisals completed prior to 2008. In 2012, the SMHC Properties appraised for $15,225,000. Today, the condition of the SMHC Properties is similar to their condition in 2012. Property values have declined by over forty (40%) percent.

In addition, over the past several years, the manufactured homes in SMHC's parks have experienced a significant amount of financial distress due to homeowners being unable to sell because potential buyers cannot obtain financing. Thus, the homeowners often default on their loan agreements with third party lenders and abandon the homes to foreclosure. As a result, occupancy rates have declined at the various SMHC Properties.

As a result of the defaults, third party lenders have repossessed and continue to repossess large numbers of manufactured homes and offer to sell the homes to buyers who would remove the homes from the SMHC Properties.

Because of industry wide high default rates, most third party lenders have ceased offering manufactured home loans, and loans for pre-owned homes are almost non-existent. Residents who need to sell their homes for cash usually have two choices: sell to a broker/buyer who will tow it out of the SMHC park or sell to Value Homes.

In order to preserve the going concern value of each of the parks, Value Homes must purchase the manufactured homes for cash, refurbish them and resell them with low down payments in order to ensure that the properties do not suffer a substantial decrease in vacancy rates that would be detrimental to the viability of the entire park. This has caused severe cash flow problems for the companies.

In May 2013, the SMHC Claim and Value Homes Claim matured and the SMHC Claim and Value Homes Claim became immediately due and payable.

Due to reduced occupancy rates, depreciated real estate values, and cash flow requirements, Debtors are unable to (a) service the SMHC Claim and the Value Homes Claim or (b) obtain alternative financing to satisfy or substantially pay down the SMHC Claim and Value Homes Claim.

## III. POST PETITION EVENTS OF SIGNIFICANCE

### A. Post-Petition Transfers Outside the Ordinary Course of business.

The Debtors have operated in the ordinary course of business. Any transactions that are outside of the ordinary course of business require approval from the Bankruptcy Court.

Debtors' counsel, Kerr, Russell and Weber, PLC, is currently holding a retainer and trust payments in the amount of $15,000 in connection with the Debtors' Chapter 11 filing, which includes the Debtors' Chapter 11 filing fees. All of these funds are being held in the attorney-client trust account at Kerr, Russell and Weber, PLC.

As discussed below, the Court has entered cash collateral orders authorizing Debtors to make certain expenditures within the ordinary course of its business, as set forth in budgets that have been filed with the Court.

The Debtors have made no post-petition transfers outside the ordinary course of business other than disclosed herein.

### B. Chapter 11 Events

#### 1. Cash Collateral

On April 1, 2014, SMHC and Value Homes each filed a First Day Motion for Entry of an Interim Order and Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Motion"). On April 4, 2014, the Court conducted a hearing on the Cash Collateral Motion, and the Court entered the Interim and Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Order"). The Cash Collateral Order became a Final Order by its own terms when no parties filed objections.

The Cash Collateral Order granted Talmer, the only creditor who asserts an interest in cash collateral, adequate protection in the form of replacement liens to the extent that Debtors used Talmer's collateral and failed to replace it.

#### 2. Joint Administration

On April 1, 2014, SMHC and Value Homes each filed a First Day Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion"). On April 4, 2014, the

Court conducted a hearing and entered an Order Directing Joint Administration of the Debtors' Chapter 11 Cases, which requires that all pleadings or documents be filed under the SMHC case.

### 3.      General/Miscellaneous

On April 29, 2014, the Debtors attended a status conference and agreed to an expedited confirmation procedure. The Debtors also attended the Debtor-In-Possession conference with the United States Trustee and the § 341 meeting of creditors. The Debtors have complied with all United States Trustee requirements and have timely filed their monthly operating reports.

### 4.      Summary of Plan

Debtors propose to restructure the Talmer Claims through the Plan in order to ensure that the Debtors are able to service the Talmer Allowed Secured Claims through their ongoing operations. Based upon the conditions described above under "Causes for Chapter 11 Filing", Debtors are not in a position to service the entire indebtedness owed to Talmer, and there are no other banks or lending institutions who have expressed an interest in providing replacement financing due to the nature of the collateral and the depreciated real estate values.

Furthermore, SMHC will be required to expend significant resources for critical maintenance and improvements to the SMHC Properties. If these critical capital improvements are not completed, SMHC anticipates that the going concern value of its operations will suffer, as current and prospective manufactured home owners will endeavor to live in other manufactured home communities with better amenities.

The anticipated maintenance expenses and capital improvements required for the Debtors' operations in order to ensure their continued viability are fully described in **Exhibit E** of this Plan.

As a result, the Debtors propose to make interest only payments to Talmer for the first 18 months after the Effective Date. The interest only permits will ensure that the Debtors have necessary cash-flow in order to complete capital expenditures necessary to improve the manufactured home parks at each of the SMHC Properties. These capital improvements will increase the value of the SMHC Properties for the benefit of Talmer and increase Debtors' ability to satisfy the Allowed Secured Claims of Talmer within five years, as set forth in the Plan.

### C.    Pending and Contemplated Litigation Involving the Debtor

As stated above, SMHC rents land to numerous manufactured home owners pursuant to Home Site Lease Agreements. As of the Petition Date, SMHC was a plaintiff in lawsuits against certain site owners who had failed to timely pay rent. SMHC sought to evict these homeowners and/or compel them to pay rent. SMHC will continue to pursue similar lawsuits against owners who fail to pay rent in the ordinary course of its business operations, and such claims and Causes of Action are preserved through the Plan.

Value Homes enters into retail installment contracts with certain homeowners who purchase their manufactured homes through financing from Value Homes. As of the Petition Date, Value Homes was a plaintiff in lawsuits seeking to enforce its rights under the retail installment contracts against owners who failed to timely make their installment payments. Value Homes sought to collect payments and/or enforce its liens against the manufactured homes. Value Homes will continue to pursue similar lawsuits against owners who fail to make their installment payments in the ordinary course of its business operations, and such claims and Causes of Action are preserved through the Plan.

Debtors have not commenced, nor were they a party to, any adversary proceedings.

## IV.    LIQUIDATION ANALYSIS, CLAIMS AND FINANCIAL INFORMATION

### A.    Liquidation Analysis

Debtors' Liquidation Analysis is attached hereto as **Exhibit A**. This Liquidation Analysis contains an estimate of the total amount of Administrative Claims, Secured Claims, Priority Claims and Unsecured Claims.

Under a liquidation scenario, Debtors' assets could be liquidated either under:

1.    A plan of liquidation under Chapter 11 of the Code; or,

2.    A straight bankruptcy liquidation under Chapter 7 of the Code.

Under either alternative, the operations of the Debtors would cease, as Debtors would only realize the forced, "fire sale" value of their assets. Key employees would quit, causing severe disruption to operations and administration

and ability to sell the manufactured home parks. Homeowners would be panicked and many would sell their homes to brokers to be moved out or accept offers to have their homes moved free and receive reduced rents at competitors' properties that they perceived as being more stable. If Value Homes could not buy third party repossessed homes, others would remove them from the SMHC Properties. Other residents and retail installment borrowers would choose to withhold payments which would further harm cash flow because of the uncertainties of the liquidation process. Further, the ability to enforce community standards would decline, resulting in additional loss of desirability to prospective new residents. SMHC had 80 new homeowners move into its parks during 2013 (64 Value Homes customers and 16 private sales). There would be little or no new homeowners moving into the parks during a liquidation or similar scenario.

Under any liquidation scenario, the amount of funds realized by Talmer would be substantially less than the amount of the Talmer Allowed Secured Claims, and Talmer would likely hold an unsecured claim totaling over $10 million. Accordingly, Debtors anticipate that in a liquidation, unsecured creditors would receive no distribution towards their Claims, and Talmer's unsecured deficiency claim would increase significantly.

Debtors assert that the treatment of creditors under the Plan is fair and equitable and it is in their best interest to consider a vote in favor of the Debtors' Plan.

### B. Risks, Conditions And Assumptions

Debtor has used fair market value and forced sale value to determine the value of its assets. In 2012, the SMHC Properties were appraised for $15,225,000. Debtors have not obtained an updated appraisal of the SMHC Properties, but the value of the SMHC Properties is similar today. If anything, the value may be lower based upon the significant improvements and maintenance that are required to be performed at the SMHC Properties.

The value of the assets will decrease dramatically in liquidation where the business operations close. To the extent the business continues to operate, the Debtors will have an ongoing, viable business with significant value as a going concern.

### C. Potential Claims and Causes of Action

Upon information and belief, the only Causes of Action held by the Debtors consist of potential claims for eviction or collection of unpaid rent

pursuant to the various home site lease agreements between SMHC and manufactured home owners and claims to collect retail installment payments under various retail installment contracts between manufactured home owners and Value Homes. These claims have been pursued and will continue to be preserved by the Debtors in the ordinary course of their businesses and are expressly preserved and will survive the Confirmation Order.

The Debtors assert that there are no Avoidance Actions that may be asserted, or the value of any Avoidance Actions is de minimis. The Debtors have generally promptly paid their outstanding invoices in the ordinary course of their businesses, and there are no trade creditor claims in these proceedings. As a result, the Debtors propose to waive any Avoidance Actions through the Plan.

Unless expressly waived or settled in the Plan or Confirmation Order, all Causes of Action, excluding Avoidance Actions, are expressly reserved, whether or not specifically listed in this Plan, Disclosure Statement or Debtors' bankruptcy schedules filed with the Court. No preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any Causes of Action as a consequence of the Confirmation, the Effective Date or Consummation of the Plan.

### D.     Co-Debtor and Guarantors

The following is a list of co-debtors/guarantors with respect to indebtedness owed by each Debtor. None of the statements made herein should be construed as admissions as to liability on the part of any party.

1.     Ralph Scofield has personally guaranteed the indebtedness owed by Value Homes and SMHC to Talmer.

2.     Value Homes and SMHC have guaranteed the obligations of each of the other entities owed to Talmer.

3.     Ralph Scofield has personally guaranteed the indebtedness owed by Value Homes to Signature and has pledged certain collateral in connection with the loan.

## V.     IMPLEMENTATION OF THE PLAN

### A.     Financial Information and Projections

The information contained in this Disclosure Statement has not been subject to a certified audit. The information has been compiled from the records of

the Debtors and is true and accurate to the best of Debtors' knowledge, information and belief. The information is also based on an income projections performed by the Debtors. Attached to this Disclosure Statement as **Exhibit B** are cash flow projections compiled by the Debtors that cover the time period in which the Debtors proposes to effectuate payments under the Plan. Since the cash flow projections are based on estimates and assumptions which are inherently subject to uncertainty and variation depending upon evolving events, neither the Debtors, nor its principals nor its management warrant that the results reflected in the cash flow projections will be achieved.

These cash flow projections indicate that the Debtors will generate a positive cash flow going forward. More importantly, these cash flows demonstrate that the Debtors will be able to meet its obligations to all creditors under the Plan. The Debtors anticipates that operations will continue on a trend similar to 2013 and 2014 year-to-date operations.

The accuracy of the projections is dependent upon a number of variables, many of which cannot be predicted, including but not limited to (i) the economy, (ii) changes to laws and regulations, and (iii) various other market conditions.

The Debtors have attached as **Exhibit C**, information from the Debtors' April monthly financial statements, the only statements that have been filed thus far with the Bankruptcy Court. These financial statements summarize financial information relating to the Debtors' post-petition operations.

The Debtor have attached as **Exhibit D**, a summary of its pre-petition financial results dating back three years prior to the Petition Date.

## B.    <u>Post-Petition Management</u>

Upon confirmation, Ralph Scofield will continue to be the managing member of SMHC and Value Homes pursuant to a similar compensation structure that existed prior to the Petition Date. Steven Combs will continue to perform similar job duties to the duties that he performed prior to the Petition Date. Mr. Scofield anticipates earning $120,000 per year through fiscal year ending June 30, 2015 and Steven Combs anticipates earning $114,000 through fiscal year ending June 30, 2015. Mr. Scofield and Mr. Combs anticipate receiving raises of less than 2% per year thereafter, subject to the cash-flow and overall financial health of the businesses. No medical, retirement or other fringe benefits will be received by either individual.

### C.    **Tax Ramifications**

Unless otherwise expressly provided in the Plan, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

The Debtors believe that the forgiveness of indebtedness which may result from a discharge granted by the confirmation of the Plan will not result in a significant tax consequence to the Debtors. The forgiveness of indebtedness, pursuant to the Internal Revenue Code, can be applied either to the Debtors' basis in its assets or to net operating loss carry forward. The Debtors cannot accurately determine the amount and extent of any forgiveness of indebtedness. First, the Debtors must determine if all of the Claims that have been filed, or deemed filed within this Case, are accurate. Also, depending on whether the Debtors achieves or exceeds the projection in its current fiscal year, the Debtors may elect to apply any forgiveness of a debt in this directly to its basis. Despite the fact that the Debtors believes that it can apply such forgiveness of indebtedness to net operating loss carry forward, it is not expected that the amount of forgiveness of debt will be totally offset by the foregoing. However, once these net operating losses are used by the Debtors to offset forgiveness of indebtedness, they cannot be used again. Taxes paid by the Debtors in the future years would, therefore, may be impacted as a result of confirmation of the Plan.

As stated, the Debtors have reserved their rights to modify, amend or supplement this Plan in accordance with the requirements of the Bankruptcy Code. The Debtors further reserve their rights to make modifications with respect to the treatment of the Intercompany Receivable and matters relating to corporate structure at any time prior to the Confirmation Hearing. Such modifications may alter the tax ramifications set forth herein with respect to the Debtors only. Any such modifications shall be contained in the Confirmation Order.

## VI.    **LEGAL REQUIREMENTS**

### A.    **Voting Procedures**

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of Claims, or equity interest, that are impaired under the plan. Accordingly, classes of Claims or interests that are not impaired are <u>not</u> entitled to vote on the plan.

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its Claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of Claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain Claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a Claim will not be counted if such Claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to 11 U.S.C. §502 and Bankruptcy Rule 3018.

Voting on the Plan by each holder of a Claim or interest in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a Claim or interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**B.**     <u>**Acceptance**</u>

The Bankruptcy Code defines acceptance of a plan by an impaired class of Claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the Claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

## C.    Confirmation

11 U.S.C. §1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. §1129(a) are these:

1. Each class of impaired creditors and interests must accept the Plan, as described in paragraph VI.B., above.

2. *Either* each holder of a Claim or interest in a class must accept the plan, *or* the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## D.    Modification

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

## E.    Effect of Confirmation

If the plan is confirmed by the Court:

1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the plan:

    (a) In the case of a corporation that is reorganizing and continuing business:

       (1) All claims and interests will be discharged.

       (2) Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

(b) In the case of a <u>corporation</u> that is liquidating and not continuing its business:

(1) Claims and interests will not be discharged.

(2) Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

(c) In the case of an individual or husband and wife:

(1) Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 727(a).

(2) Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727(a).

See Part II-A of the Disclosure Statement to determine which of the above paragraphs applies in this case.

**[*Signatures on following page*]**

Respectfully Submitted,

Dated:  June 6, 2014                    **SMHC LLC**

By:  /s/ Ralph Scofield

Ralph Scofield

Its:  Managing Member

Dated:  June 6, 2014                    **VALUE HOMES, L.L.C.**

By:  /s/ Ralph Scofield

Ralph Scofield

Its:  Managing Member

Dated:  June 6, 2014                    **Kerr, Russell and Weber, PLC**
Counsel for Debtors and
Debtors-in-Possession

By:  /s/ Jason W. Bank

Jason W. Bank (P54447)
500 Woodward Avenue, Suite 2500
Detroit, Michigan 48226
(313) 961-0200
jbank@kerr-russell.com

**EXHIBIT A**

**LIQUIDATION ANALYSIS**

# SMHC LLC LIQUIDATION ANALYSIS[1]

| Description of Collateral | Lien Holders | Market Value ("MV") & Forced Sale Value ("FS") | Amount of Secured Claim | Amount of Equity | Comments |
|---|---|---|---|---|---|
| Cash | Talmer | $181,000 (MV) $181,000 (FS) | $15,214,000[2] | $0 | |
| Value Homes Receivable | Talmer | $0 (MV) $0 (FS) | $15,214,000 | $0 | Receivable equals approximately $1.4 million but is completely uncollectable. |
| 8 Manufactured home parks – real estate | Talmer | $14,270,000 (MV) $8,562,000 (FS) | $15,214,000 | $0 | FS based on 60% of going concern appraisal |

Total equity if fair market value used =    $     0
Total equity if forced sale value used =    $     0

B.    2012 appraisal of $15,225,000 (conditions remain stable) less deferred maintenance and repairs $955,000.

C.    No known claims or Avoidance Actions. Only claims are for unpayment of rent and vary from time to time. Value of such claims is typically less than $5,000.

D.    Priority claims:

     Oakland County Property Tax      $     3,600
     IRS due 6/15/2014      $    59,000

---

[1] Unless otherwise stated, information stated is as of April 30, 2014.
[2] Does not include Value Homes debt to Talmer.

| | | |
|---|---|---|
| United States Trustee Fees | $ | 2,000 (estimated) |
| Professional Fees | $ | 35,000 (estimated) |

E.    No unsecured claims.

F.    Debt guarantee: Personal guaranty of Ralph Scofield on all Talmer Bank debt. Value Homes has also guaranteed Talmer debt. Values and debt stated above.

# VALUE HOMES, L.L.C. LIQUIDATION ANALYSIS[1]

| Description of Collateral | Lien Holders | Market Value ("MV") & Forced Sale Value ("FS") | Amount of Secured Claim | Amount of Equity | Comments |
|---|---|---|---|---|---|
| Cash | Talmer | $96,000 (MV) $96,000 (FS) | $2,994,000[2] | $0 | |
| Receivables | Talmer | $6,000 (MV) $4,000 (FS) | $2,994,000 | $0 | |
| Contracts | Talmer | $2,068,000 (MV) $1,241,000 (FS) | $2,994,000 | $0 | |
| Inventory | Talmer | $724,000 (MV) $436,000 (FS) | $2,994,000 | $0 | |
| Equipment | Talmer | $7,000 (MV) $4,000 (FS) | $2,994,000 | $0 | |

Total equity if fair market value used =     $     0
Total equity if forced sale value used =     $     0

B.    Market value of receivables, contracts, inventory and equipment is estimated to be 50% of face value. Forced sale value is estimated to be 60% of market value.

C.    No known claims or Avoidance Actions. Only claims are for unpayment of purchase money installment contracts included in the values set forth above.

D.    Priority claims:

| | | |
|---|---|---|
| Signature Bank | $ | 950,000 |
| IRS due 6/15/2014 | $ | 6,400 |
| United States Trustee Fees | $ | 1,000 (estimated) |
| Professional Fees | $ | 15,000 (estimated) |

---

[1] Unless otherwise stated, information stated is as of April 30, 2014.
[2] Does not include SMHC debt to Talmer.

E.    No unsecured claims.

F.    Debt guarantee:  Personal guaranty of Ralph Scofield on all Talmer Bank
and Signature Bank debt.

**EXHIBIT B**

**CASH FLOW PROJECTIONS**

## SMHC LLC Projections
### (5 Year Outlook)

| Year ended 6/30 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Cash In:** | | | | | |
| Revenue | 3,167,000 | 3,197,000 | 3,227,000 | 3,257,000 | 3,287,000 |
| Unpaid VH Rents Receivables | (146,000) | (86,000) | (26,000) | - | - |
| | 3,021,000 | 3,111,000 | 3,201,000 | 3,257,000 | 3,287,000 |
| | | | | | |
| **(Cash Out)** | | | | | |
| Operating Expenses | (1,605,000) | (1,620,000) | (1,635,000) | (1,650,000) | (1,665,000) |
| VH reimbursement - Unpaid | (109,000) | (114,000) | (119,000) | (124,000) | (129,000) |
| VH reimbursement - Paid | | | | 54,000 | 129,000 |
| Deferred Maintenance | (400,000) | (250,000) | (200,000) | (200,000) | (200,000) |
| 4% Management Fees | (120,000) | (122,000) | (123,000) | (124,000) | (125,000) |
| Operating Cash Out | (2,234,000) | (2,106,000) | (2,077,000) | (2,044,000) | (1,990,000) |
| | | | | | |
| Operating Cash Flow | 787,000 | 1,005,000 | 1,124,000 | 1,213,000 | 1,297,000 |
| | | | | | |
| Interest & Principal Talmer | (434,000) | (695,000) | (954,000) | (954,000) | (954,000) |
| Income Taxes | (234,000) | (240,000) | (246,000) | (252,000) | (258,000) |
| | | | | | |
| Net Cash Flow | 119,000 | 70,000 | (76,000) | 7,000 | 85,000 |
| | | | | | |
| Cash Transfers to VH | (7,000) | - | - | - | - |
| Adjusted Cash Flow | 112,000 | 70,000 | (76,000) | 7,000 | 85,000 |

# Value Homes Projections
## (5 Year Outlook)

| Year ended 6/30 | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|
| Cash In: | | | | | |
| Cash Sales & Downpayments | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| Due on Contracts Receivable | 792,000 | 912,000 | 1,032,000 | 1,152,000 | 1,272,000 |
| Collection Losses | (36,000) | (40,000) | (44,000) | (48,000) | (52,000) |
| New Contracts 1/2 year | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| Net Cash In | 996,000 | 1,112,000 | 1,228,000 | 1,344,000 | 1,460,000 |
| | | | | | |
| (Cash Out) | | | | | |
| Buy & Renovate | (800,000) | (800,000) | (800,000) | (800,000) | (800,000) |
| Operating Expenses | (172,000) | (182,000) | (192,000) | (202,000) | (212,000) |
| Reorganization Expense | (15,000) | | | | |
| Unpaid SMHC Admin Charges Payable | 109,000 | 114,000 | 119,000 | 124,000 | 129,000 |
| | | | | (54,000) | (129,000) |
| Rents to SMHC - $146,000 Due Annually | | (60,000) | (120,000) | (146,000) | (146,000) |
| Operating Cash Out | (878,000) | (928,000) | (993,000) | (1,078,000) | (1,158,000) |
| | | | | | |
| Operating Cash Flow | 118,000 | 184,000 | 235,000 | 266,000 | 302,000 |
| | | | | | |
| Interest & Principal Talmer | (84,000) | (134,000) | (184,000) | (184,000) | (184,000) |
| Interest - Signature[1] | (36,000) | (36,000) | (36,000) | (36,000) | (36,000) |
| Income Taxes | (5,000) | (5,000) | (5,000) | (10,000) | (15,000) |
| | | | | | |
| Net Cash Flow | (7,000) | 9,000 | 10,000 | 36,000 | 67,000 |
| | | | | | |
| Cash Transfer from SMHC | 7,000 | - | - | - | - |
| Adjusted Cash Flow | - | 9,000 | 10,000 | 36,000 | 67,000 |

[1] Subject to refinancing October 2014

# EXHIBIT C

### SUMMARY OF DEBTOR'S FINANCIAL STATEMENTS

## NOTE:
### DEBTORS HAVE ONLY FILED MONTHLY STATEMENTS FOR APRIL. ACCORDINGLY, THE FINANCIAL INFORMATION INCLUDED IN EXHIBIT C IS FOR APRIL ONLY.
### MAY MONTHLY FINANCIAL STATEMENTS ARE NOT DUE UNTIL JUNE 20

SMCH LLC

## OPERATING STATEMENT (P&L)

Period Ending: _APRIL 30, 2014_

Case No: 14-45579-mbm

| | Current Month | THIS IS FIRST MONTH |
|---|---|---|
| Total Revenue/Sales – RENTS | 266,760.65 | Total Since Filing – SAME AS CURRENT MONTH |
| Cost of Sales | | |
| GROSS PROFIT | 266,760.65 | |
| EXPENSES: | | |
| Officer Compensation | 9,000.00 | |
| Salary Expenses other Employees | 26,195.44 | |
| Employee Benefits & Pensions | | |
| Payroll Taxes | 4,811.42 | |
| Other Taxes | 106,184.64 | |
| Rent and Lease Expense | | |
| Interest Expense | | |
| Insurance | 2,230.74 | |
| Automobile and Truck Expense | 555.48 | |
| Utilities (gas, electric, phone) | 35,359.11 | |
| Depreciation | | |
| Travel and Entertainment | | |
| Repairs and Maintenance | 12,626.97 | |
| Advertising | 469.20 | |
| Supplies, Office Expense, etc. | 3,506.95 | |
| Other Specify – Adm. EXPENSE REImbursEMENT DUE FROM VALUE HOMES, L.L.C | (11,596.50) | |
| TOTAL EXPENSES: | 189,343.45 | |
| NET OPERATING PROFIT/(LOSS) | 77,417.20 | |
| Add: Non-Operating Income: Interest Income | | |
| Other Income | | |
| Less: Non-Operating Expenses: Professional Fees – CREDIT REPORTS & EMPLOYEE SCREENING Other | 658.35 | |
| NET INCOME/(LOSS) | 76,758.85 | |

_Form 2_

2

# VALUE HOMES, L.L.C.

## OPERATING STATEMENT (P&L)

Period Ending: *April 30, 2014*

Case No: 14-45581-mbm

| | Current Month | | Total Since Filing |
|---|---|---|---|
| Total Revenue/Sales | 220,769.92 | ← *Same as column 1* | |
| Cost of Sales | 176,259.20 | | |
| GROSS PROFIT | 44,510.72 | | |
| EXPENSES: | | | |
| Officer Compensation | | | |
| Salary Expenses other Employees | | | |
| Employee Benefits & Pensions | | | |
| Payroll Taxes | | | |
| Other Taxes | | | |
| Rent and Lease Expense | | | |
| Interest Expense | | | |
| Insurance | | | |
| Automobile and Truck Expense | | | |
| Utilities (gas, electric, phone) | 4,329.12 | | |
| Depreciation | | | |
| Travel and Entertainment | | | |
| Repairs and Maintenance | 221.88 | | |
| Advertising | | | |
| Supplies, Office Expense, etc. | 129.12 | | |
| Other Specify SERVICES BY SMHC LLC | 11,596.50 | | |
| Other Specify BANK FEES | 118.80 | | |
| TOTAL EXPENSES: | 16,395.42 | | |
| NET OPERATING PROFIT/(LOSS) | 28,115.30 | | |
| Add: Non-Operating Income: Interest Income | | | |
| Other Income | 256.54 | | |
| Less: Non-Operating Expenses: Professional Fees | | | |
| Other | | | |
| NET INCOME/(LOSS) | 28,371.84 | | |

*Form 2*

14-45581-mbm   Doc 24   Filed 05/29/14   Entered 05/29/14 14:22:23   Page 2 of 21
14-45579-mbm   Doc 46   Filed 06/06/14   Entered 06/06/14 14:58:08   Page 45 of 64

2

# EXHIBIT D

## PRE-PETITION FINANCIAL RESULTS

{85000/54/DT864291.DOCX;1}

## SMHC LLC - and predecessor operations
## Summary of Pre-Petition Financial Statements

| Year ending | **12/31/2011** | **12/31/2012** | **12/31/2013** | |
|---|---|---|---|---|
| Quarter ending | | | | **3/31/2014** |
| Net Rents | 2,996,562 | 3,093,319 | 3,156,109 | 753,336 |
| Operating Expenses | (1,612,473) | (1,585,108) | (1,701,646) | (567,484) |
| Gross Profit | 1,384,089 | 1,508,211 | 1,454,463 | 185,852 |
| Interest | (799,091) | (820,950) | (582,555) | (121,854) |
| Amortization | (14,531) | (14,531) | (1,211) | - |
| Asset Disposal | (6,234) | (73,290) | (169,251) | - |
| Net Operations | 564,233 | 599,440 | 701,446 | 63,998 |
| Equity Charges | | | | |
| Management Fee | (119,862) | (123,733) | (126,244) | (51,211) |
| Depreciation | (418,936) | (428,039) | (360,528) | - |
| Amortization | (29,333) | (29,333) | (29,335) | - |
| Net | (3,898) | 18,335 | 185,339 | 12,787 |

## Value Homes, L.L.C
### Summary of Pre-Petition Financial Statements

| Year ending | **12/31/2011** | **12/31/2012** | **12/31/2013** | |
|---|---|---|---|---|
| Quarter ending | | | | **3/31/2014** |
| | | | | |
| Home Sales | 1,057,805 | 1,276,681 | 1,436,770 | 237,960 |
| Cost of Sales | (992,205) | (1,223,865) | (1,472,500) | (214,658) |
| Interest Income | 309,551 | 355,420 | 401,189 | 113,881 |
| Financing Costs | (209,946) | (204,188) | (138,616) | (30,985) |
| Other Income | - | 317 | 2,214 | 1,347 |
| Operating Expense | (112,933) | (146,106) | (172,004) | (56,515) |
| Inerest Expense | (42,275) | (48,238) | (42,142) | (11,890) |
| Net Income | 9,997 | 10,021 | 14,911 | 39,140 |

# EXHIBIT E

## MAINTENANCE EXPENSES AND CAPITAL IMPROVEMENTS

# SMHC LLC
## Deferred Maintenance and Repairs Summary

October 31, 2013

| | | |
|---|---|---:|
| 1 | East Bay | $39,857.40 |
| 2 | Fawn Lake Estates | 87,170.96 |
| 3 | Lake Fenton MHC | 171,868.34 |
| 4 | Loon Lake | 29,516.40 |
| 5 | North Bay Harbor Club | 185,999.56 |
| 6 | South Valley Estates | 399,319.02 |
| 7 | Swartz Creek Estates | 41,710.70 |
| | | $955,442.38 |

# EAST BAY MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

**CATCH BASINS**

| | | |
|---|---|---:|
| Repair, reset iron and repour curb on 11 @ $690/ each | | 7,590.00 |
| Vacuum 11 Sumps @ $500/each | | 5,500.00 |
| Replace 1 broken East Jordan Iron Works frame | | 1,500.00 |
| | | $14,590.00 |

**BIRM TREES**

| | | |
|---|---|---:|
| Cut down and chip old and dying Austrian Pines on Birm | 38 @ $400/each | 15,200.00 |
| Grind Austrian Pine stumps | 41 @ $36/each | 1,476.00 |
| Haul off stump grindings | | 300.00 |
| Lawn Restoration (10 yards of top soil, seed, straw and labor) | | 750.00 |
| | | $17,726.00 |

**STOCKADE FENCING**

| | | | |
|---|---|---|---:|
| Purchase new fencing sections | 45 @ | $75.00 /section | 3,375.00 |
| Purchase new fencing posts | 15 @ | $47.76 /each | 716.40 |
| Installation of sections and posts | | | 1,700.00 |
| Dispose of old fencing sections and posts | 2 @ | $125.00 /each dump trailer | 250.00 |
| | | | $6,041.40 |

**WELLS**

| | |
|---|---:|
| Abandon Test Well with hole plug and cap off | $1,500.00 |

**TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT EAST BAY MANUFACTURED HOME COMMUNITY**

**$39,857.40**

# FAWN LAKE ESTATES
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

### STREET PAVING PER SQ. FT.

Mill off 2" of wear course and resurface
Based on a budgetting quote to mill off 2" and repair wear course of 1 mile x 21' wide

| | | | |
|---|---|---|---|
| 810 lineal feet x 21' wide | 17,010 sq. ft. @ $120,000/mile | | 18,409.09 |
| Allowance for 2 areas of deeper milling & repaving | | | 4,000.00 |
| | | | $22,409.09 |

### CONCRETE

Driveways (Immediate Need):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 3 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 93 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 94 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 95 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 101 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 115 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 118 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 121 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 122 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Haul out old concrete and debris | | | 4 loads @ $200/load | | 800.00 |
| | | | | | $16,736.00 |

Driveways (Within 2 years):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 6 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 35 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 37 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 63 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 64 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 67 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 105 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 107 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 108 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 112 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 113 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Haul out old concrete and debris | | | 5 loads @ $200/load | | 1,000.00 |
| | | | | | $21,916.00 |

# FAWN LAKE ESTATES
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

### CONCRETE (CON'T)
Sidewalks (3'6" wide):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 1 | 3.5' x 15' | 52.5 | 98.70 | 162.75 | 261.45 |
| Lot 43 | 3.5' x 20' | 70 | 131.60 | 217.00 | 348.60 |
| Lot 47 | 3.5' x 24' | 84 | 157.92 | 260.40 | 418.32 |
| Lot 71 | 3.5' x 25' | 87.5 | 164.50 | 271.25 | 435.75 |
| Lot 77 | 3.5' x 20' | 70 | 131.60 | 217.00 | 348.60 |
| Lot 85 | 3.5' x 20' | 70 | 131.60 | 217.00 | 348.60 |
| Lot 105 & 106 | 3.5' x 40' | 140 | 263.20 | 434.00 | 697.20 |
| Lot 118 | 3.5' x 10' | 35 | 65.80 | 108.50 | 174.30 |
| Lot 119 | 3.5' x 10' | 35 | 65.80 | 108.50 | 174.30 |
| Lot 120 | 3.5' x 15' | 52.5 | 98.70 | 162.75 | 261.45 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Haul out old concrete and debris | | | 2 loads @ $200/load | | 400.00 |
| | | | | | $3,868.57 |

### TREES

| | | |
|---|---|---|
| Cut down & remove 3 trees & grind stumps | 3 @ $900/tree | 2,700.00 |
| Grind additional 18 stumps (Various sizes) | | 975.00 |
| Chip up brush & disperse in field | | 300.00 |
| Lawn restoration, topsoil, seed, straw & labor | 40 stumps @ $80/stump | 3,200.00 |
| | | $7,175.00 |

### SEWER LIFT STATION
Per inspection dated 10/16/2013, guide rails for both sewer pumps are rotted at the bottom of the lift station. We are getting a quote to replace them but the anticipated cost is:                                                                $4,200.00

### FENCING:

| | | |
|---|---|---|
| Remove 75 sections of rotted stockade fencing | 75 @ $22.50/section | 1,687.50 |
| Disposal of old sections | 75 @ $8.00/section | 600.00 |
| Purchase new 2"x12' fence posts | 10 @ $57.88/section | 578.80 |
| Install new posts | 10 @ $35.00/section | 350.00 |
| Purchase new 6' x 8' stockade sections | 75 @ $79.50/section | 5,962.50 |
| Install new 6' x 8' stockade sections | 75 @ $22.50/section | 1,687.50 |
| | | $10,866.30 |

## TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT FAWN LAKE ESTATES

**$87,170.96**

# LAKE FENTON MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

### CONCRETE
#### Driveways (Immediate Need):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 41 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 42 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 55 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 58 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 60 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lots 84 & 85 | 10 x 75 | 750 | 1,410.00 | 2,325.00 | 3,735.00 |
| Lot 91 | 10 x 50 | 500 | 940.00 | 1,550.00 | 2,490.00 |
| Lot 102 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 132 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Haul out old concrete and debris | | | 5 loads @ | $200/load | 1,000.00 |
| | | | | | $18,181.00 |

#### Driveways (Within 2 years):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 1 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 2 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 3 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 5 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 13 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 14 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 32 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Haul out old concrete and debris | | | 4 loads @ | $200/load | 800.00 |
| | | | | | $14,744.00 |

#### Sidewalks:
Replace 80' of 4' wide sidewalk

| | | | | |
|---|---|---|---|---|
| Tear out existing concrete | 320 sq. ft. @ | $1.88/sq. ft. | | 601.60 |
| Pour new sidewalks | 320 sq. ft. @ | $3.10/sq. ft. | | 992.00 |
| Haul out old concrete and debris | 1 load @ | $200/load | | 200.00 |
| | | | | $1,793.60 |

### CATCH BASINS/CURBS

| | | | |
|---|---|---|---|
| Reset catch basin tops | 18 @ | $700/each | 12,600.00 |
| Remove curb | 60' @ | $22/ft. | 1,320.00 |
| Pour new curb | 60' @ | $25/ft. | 1,500.00 |
| Vacuum out catch basin sumps & inlets | 18 @ | $500/each | 9,000.00 |
| Haul away old concrete & debris | 1 load @ | $200/load | 200.00 |
| Various curb patching throughout community | | | 1,500.00 |
| | | | $26,120.00 |

# LAKE FENTON MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

### STREET PAVING PER SQ. FT.

Streets: Maple, Harbor, Oak Grove and portions of North Lake Drive
Based on a budgetting quote to mill off 2" and repave wear course of 1 mile x 21' wide

| | | |
|---|---|---|
| 75,537 sq. ft @ $120,000/mile | | $81,579.96 |

### DRAINAGE

Install 200 lineal feet of 4" sock tile to correct drainage at lots 2, 3 & 4
Install 130 lineal feet of drain tile in the rear yard of lot 104
Restore lawns and haul off spoils
*Based on a previous invoice to complete a similar job at North Bay in 2011

$1,796.20

### SANITARY

| | | | |
|---|---|---|---|
| Rebuild 2 sanitary manholes | 2 | @ $1,500/each | 3,000.00 |
| Replace broken pipe beneath 3 singlewides | | | |
| 2 laborers and a machine with an operator | 20 hours | @ $225/hour | 4,500.00 |
| Material estimate for both structures, 100' of pipe, | | | |
| manhole lids and stone bedding material | | | 3,500.00 |
| Haul off spoils | 2 loads | @ $200/load | 400.00 |
| Lawn restoration, topsoil, seed, straw & labor | | | 300.00 |
| | | | $11,700.00 |

### WATERMAIN

| | | | |
|---|---|---|---|
| Dig up and clean out 3 watermain valves full of dirt & rocks | | | |
| 1 laborer and a backhoe with operator | 3 hours | @ $225/hour | 675.00 |
| Lawn restoration, topsoil, seed, straw & labor | | | 250.00 |
| | | | $925.00 |

### TREES

| | | | |
|---|---|---|---|
| Cut down 6 Shag Bark Hickory Trees | 6 | @ $900/tree | 5,400.00 |
| Grind stumps (average 25" @ $2.40/inch) | 8 | @ $60/stump | 480.00 |
| Lawn restoration, topsoil, seed, straw & labor | | | 350.00 |
| | | | $6,230.00 |

# LAKE FENTON MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

## WELLS

There are two existing wells.  One does not produce enough water and it also brings sand into the filters.  This well needs to be abandoned and replaced with a new well

The State of Michigan Department of Environmental Quality requires our water system to produce one gallon of potable water per site, per minute, with each well or a combination of wells.  At this time we cannot get enough power from the utility company to operate pumps large enough to produce 134 gallons of water per minute, also referred to as Firm Capacity.  The solution is to have three wells that produce 70 gallons of water each.  The State has indicated that they would allow the three well system for our community and as a result would reclassify our status from Non-Compliance to Compliance.  If we don't do anything, we will be reclassified as a Violation with possible penalties.

Ultimately we will end up with two new wells and one existing well.  We will abandon the one existing malfunctioning well and one test well.

The approximate costs are as follows:

| | | |
|---|---|---:|
| Drill 2 5" wells | 2 @ $4,000/each | 8,000.00 |
| Seal 2 new wells with "Neat Cement" | 2 @ $1,000/each | 2,000.00 |
| Extra screens for the water intakes (3 for each well) | 6 @ $400/each | 2,400.00 |
| Pumps - 5HP 70 to 90 gallon per minute pumps including drop pipes, pitless adaptor & control boxes. | 2 @ $13,000/each | 26,000.00 |
| Service line from each well to well house | 2 @ $500/each | 1,000.00 |
| Abandonment of existing 8" test well | | 2,000.00 |
| Abandonment of existing malfunctioning 5" well | | 1,500.00 |
| | | $42,900.00 |

## PUMPHOUSE RENOVATIONS

| | | |
|---|---|---:|
| Estimated modifications to existing pump house plumbing for labor and materials | | 4,500.00 |
| Additional chlorination pump for 3rd. Well | | 998.00 |
| Electrical upgrades for wells, chlorine pump & controls | | 2,250.00 |
| Replace 2 Extrol pressure tanks with 2 Flex Lite FL40 pressure tanks | $2,219.59/each | 4,439.18 |
| Stand by generator required by the State of MI | Installed | 14,550.00 |
| | | $26,737.18 * |

*Does not include a small building addition that may be required in order to accommodate the needed upgrades

## TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT LAKE FENTON MANUFACTURED HOME COMMUNITY

**$171,868.34**

# LOON LAKE MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

### CATCH BASINS

| | |
|---|---:|
| Vacuum 8 sumps and patch @ $800/each | 6,400.00 |
| Replace 1 broken East Jordan Iron Works frame | 1,200.00 |
| | $7,600.00 |

### TREES

| | | |
|---|---|---:|
| Cut down and remove 7 large trees | 7 @ $1,100/each | 7,700.00 |
| Grind stumps & haul off grindings, topsoil, seed & straw | 7 @ $260/each | 1,820.00 |
| Cut down various limbs around perimeter & above homes | | 2,500.00 |
| | | $12,020.00 |

### DRIVEWAYS: TEAR OUT AND REPLACE (ASAP)

| Location | Size | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| 12 | 12 x 40 | 480 | 902.40 | 1,488.00 | 2,390.40 |
| 29 | 10 x 40 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| 41 | 10 x 40 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Rental House | 10 x 40 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Rental House | 10 x 30 | 300 | n/a | 930.00 | 930.00 |

| | |
|---|---:|
| Haul away old concrete and debris: 3 loads at $200/load | 600.00 |
| | $9,896.40 |

**TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT LOON LAKE MANUFACTURED HOME COMMUNITY**

**$29,516.40**

# NORTH BAY HARBOR CLUB
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

### DRIVEWAYS: TEAR OUT AND REPLACE (ASAP)

| Lot # | Sq. Ft. | Tear out/ Haul away @ $1.80/sq. ft. |
|---|---|---|
| 2 | 400 | 720.00 |
| 10 | 600 | 1,080.00 |
| 12 | 200 | 360.00 |
| 12 | 600 | 1,080.00 |
| 14 | 400 | 720.00 |
| 15 | 200 | 360.00 |
| 18 | 400 | 720.00 |
| 19 | 400 | 720.00 |
| 20 | 400 | 720.00 |
| 48 | 500 | 900.00 |
| 65 | 400 | 720.00 |
| 68 | 400 | 720.00 |
| 71 | 500 | 900.00 |
| 76 | 400 | 720.00 |
| 83 | 200 | 360.00 |
| 84 | 400 | 720.00 |
| 85 | 400 | 720.00 |
| | 6800 sq. ft. | $12,240.00 |

### DRIVEWAYS: TEAR OUT AND REPLACE WITHIN 2 YEARS

| | | |
|---|---|---|
| 46 | 400 | 720.00 |
| 60 | 400 | 720.00 |
| 70 | 300 | 540.00 |
| 89 | 400 | 720.00 |
| | 1500 sq. ft. | $2,700.00 |

### PARKING BAYS: TEAR OUT AND REPLACE (ASAP)

| | | |
|---|---|---|
| 20x40 | 800 | 1,440.00 |
| 20x40 | 800 | 1,440.00 |
| 20x40 | 800 | 1,440.00 |
| | 2400 sq. ft. | $4,320.00 |

### STREET PAVING PER SQ. FT.

| Street Name | Length | Width | Sq. Ft. | $120,000/ Mile* |
|---|---|---|---|---|
| Clearwater | 1149 | 21 | 24,129 | 26,059.32 |
| Huron Bay | 1356 | 21 | 28,476 | 30,754.08 |
| North Bay | 1110 | 21 | 23,310 | 25,174.80 |
| | 3615 | | 75,915 | $81,988.20 |

* Based on a budgetting quote to mill off 2" and repave wear course of 1 mile long x 21' wide

# NORTH BAY HARBOR CLUB
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

### CURBS

| Length | Removal @ $22/ft | Haul Away @ $200/load | Repour @ $25/ft | Total |
|--------|--------|--------|--------|--------|
| 150 | 3,300.00 | 1,000.00 | 3,750.00 | $8,050.00 |

### CATCH BASINS

| | | |
|---|---|---|
| Repair 10 @ $700/ each | | 7,000.00 |
| Vacuum: | 7 Sumps @ $500/each | 3,500.00 |
| | 15 Inlets @ $200/each | 3,000.00 |
| | | $13,500.00 |

### DRAINAGE

Add stone under several homes to eliminate standing water

| | |
|---|---|
| 10 tons of stone delivered | 330.00 |
| 2 laborers @ $17.50/hr for 25 hours | 875.00 |
| 500 Lineal feet to improve drainage (Lots 78, 78, 80, 86, 87 and 88) | 6,874.36 * |
| *Based on a previous invoice to complete a similar job at North Bay in 2011 | |
| | $8,079.36 |

### RETAINING WALLS

Big Retaining Wall - 150 6x6x10 Timbers

| | |
|---|---|
| Remove and replace timbers:   2 laborers @ $25/hr x 1hr per timber | 7,500.00 |
| Disposal fee: 5 loads at $100/load | 500.00 |
| Replacement timbers: 150 timbers at $23.68 each | 3,552.00 |
| | $11,552.00 |

Small Retaining Walls (2) - 150 6x6x10 Timbers

| | |
|---|---|
| Remove and replace timbers:   2 laborers @ $25/hr x 1hr per timber | 7,500.00 |
| Disposal fee: 5 loads at $100/load | 500.00 |
| Replacement timbers: 150 timbers at $23.68 each | 3,552.00 |
| | $11,552.00 |

Mail House/Parking Bay Boulder Wall

| | |
|---|---|
| Remove boulders (Free to hauler) | 0.00 |
| Pour concrete knee wall - 8" thick, 42" below grade, 36" above grade | |
| 25 yards of concrete @ $110/yard | 2,750.00 |
| Labor to form and pour wall | 3,000.00 |
| Material to back fill | 600.00 |
| Acid stain wall after cured | 600.00 |
| | $6,950.00 |

# NORTH BAY HARBOR CLUB
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

**FENCING:**

15 Sections of Stockade Fencing

| | | | |
|---|---|---|---|
| Removal | 8.00 | /section | 120.00 |
| Purchase | 75.00 | /section | 1,125.00 |
| Installation | 30.00 | /section | 450.00 |
| Paint new fencing | 15.00 | /section | 225.00 |
| | | | $1,920.00 |

Cyclone Fence

Repair/replace 50 feet of damaged fence      $300.00

**MAIL HOUSE**

Clean and paint      $300.00

**LIFT STATION**

Pump out sludge and grease/clean      $1,500.00

**WELLS**

| | |
|---|---|
| State required pump test on 2 existing wells | 1,500.00 |
| Drill and install a new 90 gallon/minute pump, drop pipe, control box and service line | 14,550.00 |
| Electrical upgrade for additional well and control circuits | 1,000.00 |
| Plumbing upgrade for additonal well | 3,000.00 |
| Chlorinating system for additional well | 998.00 |
| | $21,048.00 * |

*An additional expense may be required if it is determined that
a small building addition is needed to accommodate the 3rd well
and plumbing inside of pumphouse.

**TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT NORTH
BAY HARBOR CLUB**

$185,999.56

# SOUTH VALLEY ESTATES
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

**STREET PAVING PER SQ. FT.**
Mill off 4" to 5" of existing asphalt road & parking areas & repave
Approximately 83,310 sq. ft. (See attached quote)                  $207,100.00

**CONCRETE**
Driveways (Immediate Need):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 2 | 40 x 20 | 800 | 1,504.00 | 2,480.00 | 3,984.00 |
| Lot 3 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 12 | 18 x 20 | 360 | 676.80 | 1,116.00 | 1,792.80 |
| Lot 13 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 16 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 17 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 18 | 10 x 20 | 200 | 376.00 | 620.00 | 996.00 |
| Lot 19 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 21 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 24 | 1 x 9 | 9 | 16.92 | 27.90 | 44.82 |
| Lot 28 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 29 | 25 x 20 | 500 | 940.00 | 1,550.00 | 2,490.00 |
| Lot 68 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 71 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 73 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 95 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 108 | 50 x 20 | 1000 | 1,880.00 | 3,100.00 | 4,980.00 |
| Lot 111 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 115 | 25 x 20 | 500 | 940.00 | 1,550.00 | 2,490.00 |
| | | 8969 | | | |
| Haul out old concrete and debris | | | 12 loads @ $200/load | | 2,400.00 |
| | | | | | $47,065.62 |

Driveways (Within 2 years):

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.88/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| Lot 23 | 30 x 20 | 600 | 1,128.00 | 1,860.00 | 2,988.00 |
| Lot 48 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 91 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Lot 99 | 24 x 20 | 480 | 902.40 | 1,488.00 | 2,390.40 |
| Lot 114 | 20 x 20 | 400 | 752.00 | 1,240.00 | 1,992.00 |
| Haul out old concrete and debris | | | 3 loads @ $200/load | | 600.00 |
| | | | | | $11,954.40 |

# SOUTH VALLEY ESTATES
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

**CURBS:**

| | | | |
|---|---|---|---|
| Remove 2095 feet of bad curb | 2095 ft. | @ $22/ft | 46,090.00 |
| Haul away broken curb & debris | 10 loads | @ $200/load | 2,000.00 |
| Pour 2095 ft of new curb | 2095 ft. | @ $25/ft | 52,375.00 |
| | | | $100,465.00 |

**CATCH BASINS**

| | | | |
|---|---|---|---|
| Tear down and rebuild 6 catch basins | 6 | @ $1,500/each | 9,000.00 |
| Repair and clean 17 catch basins | 17 | @ $550/each | 9,350.00 |
| | | | $18,350.00 |

**STORM PIPES**

| | | | |
|---|---|---|---|
| Purchase 75ft of 15" diameter pipe | 75ft | @ $45/ft | 3,375.00 |
| Install pipe | 75ft | @ $50/ft | 3,750.00 |
| Haul off spoils and debris | 3 loads | @ $200/load | 600.00 |
| 25 yards of crushed concrete bedding material | 25yards | @ $23/yard | 575.00 |
| | | | $8,300.00 |

**YARD DRAINAGE (LOTS 68, 69, 70 & 71)**

| | |
|---|---|
| Purchase & install 375' of 4" drain tile and 4 yard drains | $5,100.00 |

**STUMPS**

| | | | |
|---|---|---|---|
| Grind out 8 stumps averaging 20" in diameter | 8 x 20" | @ $2.40/inch | 384.00 |
| Clean up, lawn restoration, topsoil, seed, straw & labor | 8 stumps | @ $75/stump | 600.00 |
| | | | $984.00 |

**TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT SOUTH VALLEY ESTATES**

**$399,319.02**

# SWARTZ CREEK MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES

### CATCH BASINS AT SITES

| | | |
|---|---|---:|
| Repair catch basins | 3 @ $600/each | 1,800.00 |
| Remove curb | 26' @ $22/ft. | 572.00 |
| Repour curb | 26' @ $25/ft. | 650.00 |
| Haul away old concrete & debris | 1 load @ $200/load | 200.00 |
| Vacuum 6 catch basin sumps | 6 @ $500/each | 3,000.00 |
| | | $6,222.00 |

### CONCRETE

| Type/Location | Size (Ft.) | Sq. Ft. | Tear out @ $1.80/sq. ft. | Pour new @ $3.10/sq. ft. | Total |
|---|---|---|---|---|---|
| **Parking Bays:** | | | | | |
| South End Brookfield | 20 x 40 | 800 | 1,440.00 | 2,480.00 | 3,920.00 |
| East End Brookfield | 20 x 40 | 800 | 1,440.00 | 2,480.00 | 3,920.00 |
| | | | | | |
| **Driveways:** | | | | | |
| Lot 51 | 20 x 20 | 400 | 720.00 | 1,240.00 | 1,960.00 |
| Lot 52 | 20 x 20 | 400 | 720.00 | 1,240.00 | 1,960.00 |
| Lot 53 | 20 x 20 | 400 | 720.00 | 1,240.00 | 1,960.00 |
| Lot 73 (Office) | 10 x 20 | 200 | N/A | 620.00 | 620.00 |
| Lot 87 (1/2 only) | 10 x 20 | 200 | 360.00 | 620.00 | 980.00 |
| | | | | | |
| **Sidewalks:** | | | | | |
| Lot 12 | 4 x 64 | 256 | 460.80 | 1,428.48 | 1,889.28 |
| Lot 40 | 4 x 32 | 128 | 230.40 | 714.24 | 944.64 |
| Lot 46 | 4 x 120 | 480 | 864.00 | 2,678.40 | 3,542.40 |
| Lot 66 | 4 x 48 | 192 | 345.60 | 1,071.36 | 1,416.96 |
| Lot 100 | 4 x 50 | 200 | 360.00 | 1,116.00 | 1,476.00 |

Haul away old concrete and debris: 7 loads at $200/load

| | |
|---|---:|
| | 1,400.00 |
| | $25,989.28 |

# SWARTZ CREEK MANUFACTURED HOME COMMUNITY
## DEFERRED MAINTENANCE & REPAIR COST ESTIMATES (CON'T)

**STORM RETENTION POND**

Clean Out Sedement:

| | | | |
|---|---|---|---|
| Extenda back hoe & 1 dump truck | 7 hours | @ $350/hr | 2,450.00 |
| Disposal fee | 6 loads | @ $500/load | 3,000.00 |
| Lawn restoration, topsoil, seed, straw & labor | | | 700.00 |

Access Road to Lift Pumps:

| | | | |
|---|---|---|---|
| Remove sod and topsoil | 40 yards | @ $25/yard | 1,000.00 |
| Install crushed 21AA stone material | 50 tons | @ $28/ton | 1,400.00 |
| Bobcat to spread stone | 3 hours | @ $100/hr | 300.00 |

Access Gate:

| | | | |
|---|---|---|---|
| Gate from Michigan Fence Company (6' Tall x 10' wide double swinging gate) | | | 208.30 |
| Posts | 4 | @ $47.78/each | 191.12 |
| Installation | | | 250.00 |
| | | | $9,499.42 |

**TOTAL ESTIMATED COST FOR DEFERRED MAINTENANCE AND REPAIRS AT
SWARTZ CREEK MANUFACTURED HOME COMMUNITY**

$41,710.70